*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0417p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOSEPH STEWART,

          *Petitioner-Appellant,*

    *v.*

HUGH WOLFENBARGER,

          *Respondent-Appellee.*

No. 04-2419

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-75051—Robert H. Cleland, District Judge.

Argued: July 28, 2006

Decided and Filed: November 9, 2006

Before: BATCHELDER, CLAY, and ROGERS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Matthew E. Liebson, THOMPSON HINE, Cleveland, Ohio, for Appellant. Debra M. Gagliardi, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Matthew E. Liebson, Leslie W. Jacobs, THOMPSON HINE, Cleveland, Ohio, for Appellant. Brad H. Beaver, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

---

**OPINION**

---

    CLAY, Circuit Judge. Petitioner Joseph Stewart appeals the October 20, 2004 order of the United States District Court for the Eastern District of Michigan denying his application for habeas relief under 28 U.S.C. § 2254. Petitioner is currently incarcerated in Michigan state prison after a conviction for first degree murder. For the reasons set forth below, we **REVERSE** the order of the district court and **GRANT** the petition for writ of habeas corpus.

## I. BACKGROUND

### A.    PROCEDURAL HISTORY

On October 26, 1996, a state grand jury charged Petitioner with first degree murder.  On February 11, 1998, a jury found Petitioner guilty of first degree murder.  On March 3, 1998, the state trial court sentenced Petitioner to life imprisonment without the possibility of parole.

After the trial, Petitioner filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial. *People v. Stewart*, No. 211361, 2001 WL 1277451, at *1 (Mich Ct. App. Oct. 23, 2001) (unpublished decision).  Petitioner based his motions on ineffective assistance of counsel due to a conflict of interest and the failure of counsel to call several favorable witnesses. *Id.*  Without conducting an evidentiary hearing on Petitioner's claims, the state trial court denied the motions. *Id.*  Petitioner appealed, and the state court of appeals remanded the case to the state trial court to conduct an evidentiary hearing as to Petitioner's claims of ineffective assistance of counsel. *Id.*  The state trial court conducted an evidentiary hearing, and on July 10, 2001, the state trial court denied Petitioner's motion for a new trial. *Id.*  On October 23, 2001, the state court of appeals affirmed this decision. *Id.* at *6.  The state supreme court denied Petitioner leave to appeal.

On December 16, 2003, Petitioner filed an application for habeas relief under 28 U.S.C. § 2254.  Petitioner asserted eight grounds for relief.  On October 19, 2004, the district court denied the application for habeas relief.  The district court granted a certificate of appealability as to five of the eight grounds for relief.  This Court affirmed that decision.

### B.    FACTS

#### 1.    Pretrial Events

On April 22, 1996, Terrence Black was shot and killed in Detroit, Michigan, between 11 a.m. and 12 p.m.  On October 26, 1996, a state grand jury charged Roland Johnson ("Johnson") and Petitioner with first degree murder in connection with the shooting.  The police arrested Johnson, and he retained Mary Ellen O'Connell ("O'Connell") as counsel.  On January 10, 1997, the state prosecutor dismissed without prejudice the charge against Johnson.  The prosecutor had determined that the witness against Johnson, Anthony Gardner ("Gardner"), had committed perjury.

On July 21, 1997, the police arrested Petitioner. *Stewart*, 2001 WL 1277451, at *2 n.3.  Prior to his arrest, Petitioner spoke to an attorney, Juan Mateo ("Mateo").  Petitioner was unable to secure Mateo as his counsel because he did not pay Mateo's retainer fee.  After Petitioner's arrest, Petitioner secured O'Connell as his counsel. *Id.*  Johnson's family referred O'Connell to Petitioner.

#### 2.    The Trial

On February 5, 1998, on the first day of trial, there was a commotion outside of the courtroom where, in the presence of jurors, friends and relatives of the victim accused Petitioner of murdering the victim.  After the jury was brought in the courtroom, the judge explained that while some people believed Petitioner murdered the victim, such belief was not evidence.  The judge then asked the jury if any one of them believed that they could not be fair or impartial due to the prior commotion, and no juror replied in the affirmative.

In its case in chief, the prosecution called Ramone McBurroughs ("McBurroughs") as a witness.  McBurroughs testified that on April 22, 1996, he was a passenger in a car, a black Chevy Impala, driven by Petitioner.  There were two other persons in the car; "Peb" (a nickname for Johnson) and a person unknown to McBurroughs.  McBurroughs testified that Petitioner was in the

driver seat, Johnson was in the passenger seat, McBurroughs was in the back seat directly behind Petitioner, and the unknown person was in the back seat directly behind Johnson. McBurroughs testified that he saw the victim driving a truck, and the two cars stopped next to each other. The cars were facing the same direction, with the Chevy on the driver side of the pickup. The passenger side window of the Chevy and the driver side window of the pickup were rolled down. McBurroughs testified that Petitioner and the victim exchanged words and he then heard gun fire. He testified that he saw Petitioner holding a gun and pointing the gun across Johnson and at the victim. McBurroughs testified that he, Petitioner, and the victim were friends, but he was not personally aware of any problem between Petitioner and the victim.

The prosecution then called Darvin Green ("Green"), the brother of the victim. Green testified that on April 22, 1996, he was looking out the window of his residence and saw a black Chevy Impala stop next to the victim's truck. Green testified that he could not see who was in the Chevy. He testified that he saw the victim leaning out the window of the truck and laughing. Green then heard a gun shot, so he ran to get his own gun. Green heard a total of four or five shots. Green admitted that he did not know who fired the shots.

The prosecution then called Laning Davidson ("Davidson"), a county medical examiner. Davidson testified that the victim suffered from a single gunshot wound to his flank. He testified that this wound was the cause of death.

The prosecution then called Lillie Drake ("Drake"), a police officer. Drake testified that she saw the victim's truck, which had crashed into a fence. She observed bullet holes in the truck. The victim, who was unconscious, was removed from the truck. Drake testified that she found shell casings in the street.

The prosecution then called Robert Simpson ("Simpson"). Simpson testified that he was at a friend's house on April 22, 1996, between 11:00 a.m. and 1 p.m. Petitioner and Johnson arrived at the house. Petitioner asked Simpson if he knew where the victim was. Simpson testified that Petitioner was excited. He testified that Petitioner stated he was going to kill the victim. Simpson testified that he saw Petitioner leave and get into a black Chevy Impala. He testified that he saw McBurroughs also get into the Chevy, as well as Johnson. Simpson admitted that he was a good friend of the victim.

The prosecution then called Paul Kulsea ("Kulsea"), a police officer and evidence technician. Kulsea collected evidence with respect to the April 22, 1996 shooting. He observed three bullet holes in the victim's truck: one through the side of the bed, one through the roof support directly behind the door, and one through the door. He also found a handgun in the glove box. The handgun did not have a round in the chamber, although it did have a full magazine.

The prosecution then called Christopher Vintevoghel ("Vintevoghel"), a police officer. He testified that he took a statement from McBurroughs without any form of coercion.

The prosecution then called Anthony Woodford ("Woodford"), a police officer. Woodford testified that, upon arresting Petitioner, Woodford discovered Petitioner had an Ohio identification card under a different name. Woodford also discovered an application for a Michigan driver's license under that same name.

Petitioner then presented his case in chief. He called William Peterson ("Peterson"), a police officer, as a witness. Peterson testified that he did not speak to Simpson in connection with his investigation of the shooting.

Petitioner then requested to recall McBurroughs for further impeachment. The state trial court denied Petitioner's request.

Petitioner then called Neil Ziegler ("Ziegler"). Ziegler testified that he, Petitioner, William Foster ("Foster"), and Gerald Hill ("Hill") drove to Atlanta, Georgia on April 19, 1996. At that point, the prosecution objected on the ground that the alibi notice did not contain the location asserted by the alibi; it only contained the names of the alibi witnesses. The state trial court agreed, but for reasons that are unclear to this Court, the state trial court allowed Petitioner to continue to question Ziegler. The state trial court, however, disallowed the testimony of the other alibi witnesses, Foster and Hill. Ziegler testified that the group returned to Michigan between 1 p.m. and 1:30 p.m. on April 22, 1996. Ziegler admitted that he lived at "One Lafayette Place, Apartment 1401," the address that was used on an application for a Michigan driver's license submitted by one "Brian Steven Gresham," an alias used by Petitioner on an Ohio identification card.

### 3.       The Evidentiary Hearing

As stated above, the state trial court conducted an evidentiary hearing with respect to Petitioner's claims of ineffective assistance of counsel.

O'Connell testified at the evidentiary hearing. She testified that she had represented Johnson in connection with the events of April 22, 1996, but that case was dismissed. She then represented Petitioner in connection with those same events. She did not see a conflict of interest in representing Petitioner after representing Johnson on the same matter. O'Connell testified that she explained the potential conflict to Petitioner, and Petitioner wanted O'Connell to continue as his counsel. When asked whether she would have called Johnson as a witness at Petitioner's trial, O'Connell invoked attorney-client privilege. O'Connell did admit that she spoke with Johnson about testifying at Petitioner's trial. When asked whether she considered focusing on Johnson as a suspect as part of Petitioner's defense strategy, O'Connell invoked attorney-client privilege.

With respect to Mateo, O'Connell testified that she originally intended to call Mateo as a witness, but she then decided that his testimony would not have been helpful. While Mateo had indicated that he had a record of a statement taken from a person who fit the description of McBurroughs, where such person had recanted a statement made to the police, Mateo failed to produce any such record. Moreover, Mateo stated that he was unsure whether he could even identify the person from whom he had taken the statement.

Petitioner testified at the evidentiary hearing. Petitioner claimed that O'Connell never mentioned any potential conflict of interest. Petitioner testified that he wanted to call Johnson as a witness and question him as a suspect in the shooting. O'Connell stated that she could not question Johnson in that manner.

Petitioner testified that he wanted to subpoena Delshawn Williams ("Williams") to testify at his trial. Petitioner testified that Williams resided at the house at which Simpson alleged Petitioner to have made the death threat against the victim.

Petitioner testified that he wanted to subpoena Mateo to testify at his trial. Petitioner testified that McBurroughs, in Mateo's presence, had recanted the statement he made to the police. Petitioner testified that O'Connell wanted to know whether McBurroughs' recantation implicated Johnson.

James Dyckman, the human resources manager at Ziegler's place of employment, testified at the evidentiary hearing. He testified that Ziegler was not at work on April 19, 1996.[1]

---

[1] Although counsel asked whether Ziegler was present at work on April 18, 1996, the context indicates that this was an error.

Hill testified at the evidentiary hearing. Hill testified that on April 19, 1996, he, Petitioner, Ziegler, and Foster drove to Atlanta, Georgia to go to a party. He testified that the group drove back and returned to Michigan roughly after 2 p.m. on April 22, 1996.

Foster testified at the evidentiary hearing. Foster's testimony was consistent with Hill's testimony.

Williams testified at the evidentiary hearing. He testified that on April 22, 1996, he was home all day with a sprained ankle. He testified that, contrary to Simpson's testimony at trial, Simpson was not at his house on that date. He testified that, contrary to Simpson's testimony at trial, Petitioner was not at his house on that date. Williams testified that he did not testify at trial because he knew both Petitioner and the victim and he did not want to get involved. Williams testified that he was never subpoenaed to testify at Petitioner's trial. Williams testified that while he made a statement to an unknown male attorney, he was never contacted by Petitioner's trial counsel, O'Connell.

Mateo testified at the evidentiary hearing. He testified that Petitioner approached him about representing Petitioner in a murder case. He testified that at one of the meetings with Petitioner, a young African American man in a wheelchair was also present. He did not know that man's name. Mateo interviewed that man, and he testified that he recalled that the man offered some form of exculpatory evidence, although he could not recall exactly what that evidence was. Mateo testified that O'Connell contacted him about testifying with respect to the man who provided the exculpatory information, and Mateo responded that he did not recall who the man was, and he could only offer hearsay testimony as to what that man said.

## II. DISCUSSION

### A.    STANDARD OF REVIEW

When reviewing the decision of a district court on a petition for habeas relief, this Court reviews the legal conclusions *de novo* and the factual conclusions for clear error. *Stuart v. Wilson*, 442 F.3d 506, 514 (6th Cir. 2006) (citation omitted). That said, because Petitioner's habeas application was filed after the effective date of AEDPA, AEDPA applies. *Id.* (citation omitted). AEDPA requires the federal courts to give substantial deference to the decisions of state courts. Under the strictures of AEDPA, "the federal courts may not grant habeas relief for a state prisoner unless the state court adjudication of his claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Id.* at 514-15 (quoting 28 U.S.C. § 2254(d)(1)).

A state court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "[T]o be found an 'unreasonable application of . . . clearly established Federal law,' the state-court decision must be 'objectively unreasonable' and not simply erroneous or incorrect." *Johnson v. Luoma*, 425 F.3d 318, 324 (6th Cir. 2005) (quoting *Williams*, 529 U.S. at 409-11). "A legal doctrine is not 'clearly established Federal law, as determined by the Supreme Court' unless it is based on 'holdings, as opposed to the dicta, of the Court's decisions as of the time of the relevant state-court decision.'" *Jones v. Jamrog*, 414 F.3d 585, 591 (6th Cir. 2005) (quoting *Williams*, 529 U.S. at 412).

## B.    THE TRIAL COURT'S REFUSAL TO ALLOW PETITIONER TO RECALL McBURROUGHS

Petitioner claims that the state trial court's refusal to allow Petitioner to recall and reexamine McBurroughs violated Petitioner's confrontation right. We disagree.

The Confrontation Clause of the Sixth Amendment bestows upon the criminal defendant the right to confront the witnesses against him, and the opportunity to cross-examine such witnesses: "Indeed, [t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (alteration in the original) (internal quotation marks and citation omitted). That said, the criminal defendant's right to cross-examine witnesses is not limitless:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

*Id.* at 679 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)). Thus, a state trial court has discretion to limit cross-examination. Moreover, "[w]here it is merely the *extent* of cross-examination that is limited, the trial judge retains a much wider latitude of discretion." *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989).

Where the trial court limits the extent of cross-examination, the inquiry for the reviewing court is "whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory." *Id.* This Court has emphasized the jury's access to the relevant facts under this inquiry:

> [T]his Court has recognized that the bounds of the trial court's discretion are exceeded when the defense is not allowed to plac[e] before the jury *facts* from which bias, prejudice or lack of credibility of a prosecution witness might be inferred[.] This well-settled principle protects the defendant's right on cross-examination to develop facts which might undermine a government witness's credibility.

*Id.* (second and third alterations in the original) (internal quotation marks and citation omitted). Conversely, this Court has found "no authority for finding a constitutional violation where cross-examination of a key government witness was only partially limited and where the questioning that was barred was not aimed at eliciting any additional facts." *Id.* at 166.

If the jury did not have adequate information, such that "there is indeed a denial or significant diminution of cross-examination that implicates the Confrontation Clause, the Court applies a balancing test, weighing the violation against the competing interests at stake." *Boggs v. Collins*, 226 F.3d 728, 739 (6th Cir. 2000) (citation omitted).

We initially note that the inquiry is not whether the state trial court abused its discretion in disallowing Petitioner from recalling McBurroughs; the inquiry is whether the state court of appeals' decision that the state trial court did not abuse its discretion in such action was contrary to or an unreasonable application of federal law. Here, the state court of appeals identified the correct law, so the issue is whether the state court of appeals' decision was an unreasonable application of federal law, which is to say that the decision was more than simply erroneous or incorrect.

In this case, the prosecution called McBurroughs as its first witness. The state trial court stated that it would cancel the subpoena for the witness, so that the prosecution and Petitioner would have to ask any and all questions during that appearance by McBurroughs. The state trial court based its decision on the fact that McBurroughs was a paraplegic and wheelchair-bound. During the Petitioner's case in chief, Petitioner requested to recall McBurroughs to the witness stand, and the state trial court denied the request.

Petitioner argues that because the state trial court did not allow Petitioner to recall McBurroughs, Petitioner was unable to cross-examine McBurroughs with several points that arose through other witness testimony, namely: (1) the angle of the bullet entry wound; (2) the testimony of Green and several police officers that suggest that the shooting took place while both cars were in motion; and (3) the testimony of a police officer who stated that he did not threaten McBurroughs.

We find that none of these areas of inquiry would have yielded significant impeachment evidence against McBurroughs' trial testimony. With respect to (1), McBurroughs' testimony is not inconsistent with the angle of the bullet entry wound, or at least there is nothing in the record that indicates such an inconsistency. With respect to (2), McBurroughs' testimony was that Petitioner pulled up next to the victim's truck, fired several shots at the victim, and the two vehicles then drove off simultaneously. The testimony of Green and several police officers indicates that the shooting occurred while both cars were in motion. This simply is not significant impeachment evidence. With respect to (3), the police officer who questioned McBurroughs testified that he did not threaten to charge McBurroughs with the murder if McBurroughs did not make a statement, whereas McBurroughs testified that the police officer did make such a threat. This likewise is not significant impeachment evidence.

Moreover, even if we assume that this information was not insignificant impeachment evidence, the evidence was already before the jury. As stated, *supra*, the key inquiry is "whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory." *Dorsey*, 872 F.2d at 167. This Court has found "no authority for finding a constitutional violation where cross-examination of a key government witness was only partially limited and where the questioning that was barred was not aimed at eliciting any additional facts." *Id.* at 166. Here, the information that Petitioner wished to use against McBurroughs if McBurroughs were recalled was already before the jury, in the form of direct testimony from the prosecution's witnesses. Petitioner does not assert that he wished to recall McBurroughs to elicit additional facts or information. In such a case, Petitioner has not stated a constitutional violation: "When the jury hears on direct examination the evidence a petitioner feels counsel should have developed in cross-examination, the petitioner did not suffer prejudice." *Ross v. United States*, 339 F.3d 483, 495 (6th Cir. 2003) (citation omitted). Certainly, an added benefit to recalling McBurroughs to cross-examine him with respect to the testimony of the prosecution's witnesses would be to observe the demeanor of McBurroughs; this Court, however, has explicitly ruled that the trial court's deprivation of such benefit does not amount to a violation of the Confrontation Clause. *Dorsey*, 872 F.2d at 167.

The key point is that the information which Petitioner wanted to use to impeach McBurroughs was already known to the jury. In such a case, Petitioner could argue in closing argument that McBurroughs' testimony was faulty because it was impeached by the testimony of other witnesses.[2] This is in contrast to cases such as *Van Arsdall*, where the impeachment evidence precluded by the limitation on cross-examination, that the prosecution agreed to drop a criminal charge against the witness after the witness agreed to testify, was completely unknown to the jury.

---

[2] The weakness of the impeachment evidence may have been evident from the fact that Petitioner did not raise any of the impeachment points in the closing argument.

475 U.S. at 676. *See also Dorsey*, 872 F.2d at 167 ("But *Davis*, *Alford*, and *Garrett* involve trial court rulings that barred defense counsel from *adding to the fund of concrete information . . .* with which the jury could assess a government witness's credibility. We decline to extend the constitutional guarantee beyond the scope of these rulings, to encompass questioning that will do nothing more than expose the demeanor of a government witness, already on the stand, while he or she is subjected to questions that probe his credibility.") (emphasis supplied). In such a case, the state court of appeals' decision finding no abuse of discretion on the part of the state trial court was not incorrect, let alone unreasonable.

## C.      THE OUTBURST AT TRIAL BY FRIENDS AND FAMILY OF THE VICTIM

Petitioner claims that the state trial court failed to fully inquire as to the impartiality of the jury after an outburst by the victim's family and friends, so that he was denied a fair trial. We disagree.

As a threshold matter, Respondent argues that Petitioner presented this issue to the state court solely as a state claim, as opposed to a federal constitutional or statutory claim. Respondent argues that Petitioner has therefore failed to exhaust this issue as presented to this Court. A review of the record, however, reveals that Petitioner adequately briefed this claim in the state court of appeals. Nevertheless, Petitioner's claim lacks merit.

The Sixth Amendment guarantees the criminal defendant a right to a fair trial by an impartial jury. *Williams v. Bagley*, 380 F.3d 932, 943 (6th Cir. 2004) (citing *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992)). Certain disruptions during trial may affect the impartiality of the jury. In such cases, the inquiry is "whether there has been an impingement upon the right of [the defendant] to be tried before a fair and impartial jury." *United States v. Black*, 369 F.3d 1171, 1177 (10th Cir. 2004) (internal quotations and citation omitted).

On February 5, 1998, on the first day of trial, there was a commotion outside of the courtroom where friends and relatives of the victim accused Petitioner of murdering the victim, in the presence of jurors. After the jury was brought in the courtroom, the judge explained that while some people believed Petitioner murdered the victim, such belief was not evidence. The judge then asked the jury if any one of them believed that they could not be fair or impartial due to the prior commotion, and no juror replied in the affirmative.

The state court of appeals found that the state trial court did not abuse its discretion in denying Petitioner's motion for a mistrial:

> The record indicates that the trial court inquired of the members of the jury panel whether the disturbance had affected their ability to be fair and impartial. Further, the trial court instructed the jurors to disregard the outburst and to render its verdict on the basis of the evidence presented at the trial. Under the circumstances, we conclude that the trial court did not abuse its discretion when it determined that the jury could render an impartial verdict in the case and, therefore, denied defendant's motion for a mistrial.

*Stewart*, 2001 WL 1277451, at *6. We hold that the state court of appeals' decision was not contrary to or an unreasonable application of federal law.

In examining the record, we agree with the state court of appeals that the state trial court told the jurors that any comments made in the disturbance by the friends and family of the victim was not evidence and should not be considered evidence. In the same vein, the state trial court expressed that even though some persons felt that Petitioner was guilty, this was not evidence. The state trial court also expressed that the fact that some persons felt that Petitioner was guilty was not unusual

or surprising. The state trial court finally asked the jurors if there were any of them who felt that s/he could not be impartial, and no one responded. Under such facts, we find that the state trial court adequately inquired as to the impartiality of the jury after the disturbance, so Petitioner suffered no violation of his constitutional right to a fair trial.

## D.      INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner claims that his counsel's performance was deficient in four respects, and that he was prejudiced by these errors. For a claim of ineffective assistance of counsel, the petitioner must ordinarily prove two components: (1) counsel's performance was deficient; and (2) prejudice, which means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984).

We will first address those claims of counsel error that we conclude do not constitute deficient performance under the first prong of the *Strickland* test. Petitioner's primary claim is that O'Connell provided ineffective assistance of counsel because she had a conflict of interest from her prior representation of Johnson. Petitioner argues that this Court must presume prejudice and grant habeas relief due to this conflict of interest. We disagree.

In certain instances a court may presume prejudice to the petitioner. "[P]rejudice is presumed when counsel is burdened by an actual conflict of interest." *Id.* at 692 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 345-50 (1980)). In order to demonstrate such actual conflict of interest, the petitioner must show "that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* (quoting *Sullivan*, 446 U.S. at 350, 348).

In *Mickens v. Taylor*, 535 U.S. 162 (2002), the Supreme Court found that the presumed prejudice standard of *Sullivan* was clearly established only in the situation of a conflict of interest due to multiple concurrent representation. *Id.* at 175. The Supreme Court explicitly left open the question of whether the *Sullivan* standard applied to a conflict of interest due to successive representation. *Id.* at 176.

This Court has consistently held that, for § 2254 cases, the *Sullivan* standard does not apply to claims of conflict of interest other than multiple concurrent representation; in such cases, including successive representation, the *Strickland* standard applies. *See Gillard v. Mitchell*, 445 F.3d 883, 891 (6th Cir. 2006) (successive representation); *Whiting v. Burt*, 395 F.3d 602, 619-20 (6th Cir. 2005) (same counsel for trial and direct appeal); *Lordi v. Ishee*, 384 F.3d 189, 193 (6th Cir. 2005) (successive representation); *Smith v. Hofbauer*, 312 F.3d 809, 818 (6th Cir. 2002) (counsel was charged with a crime in the same county as the petitioner). Thus, the initial issue is whether the instant case involves a conflict of interest based on multiple concurrent representation or on some other ground.

This case does not involve multiple concurrent representation. O'Connell represented Johnson when he was arrested and charged with first degree murder. The prosecution then dismissed the case against Johnson. Seven months later, Petitioner retained O'Connell as counsel in connection with the same crime. In our view, O'Connell's representation of Johnson ended well before her representation with Petitioner began. Therefore, this is not a case of multiple concurrent representation, so the *Strickland* standard applies.

Petitioner argues that this Court's decision in *Moss v. United States*, 323 F.3d 445 (6th Cir. 2003), dictates that the *Sullivan* standard applies in the instant case. We disagree. In that case, a § 2255 case, the attorney Murphy represented the defendant Moss in pre-indictment proceedings but represented Moss' co-defendant Kohn at all post-indictment proceedings, including trial. *Id.* at 459.

The defendants Moss and Kohn were tried together and collaborated on a defense. *Id.* at 462. Moreover, the defendant Moss paid for the defendant Kohn's legal services. *Id.* at 463. This Court found that those facts amounted to an atypical form of successive representation where the *Sullivan* standard was appropriate. *Id.*

Petitioner's reliance on *Moss* is misplaced for three reasons. First, the instant case is factually distinguishable. Johnson and Petitioner were not tried together, nor did they collaborate on a defense, elements that are analogous to a situation of multiple concurrent representation. Furthermore, Johnson did not pay for Petitioner's legal fees, or vice versa. Second, *Moss* was a § 2255 case. Such cases differ from § 2254 cases because a federal court is not constrained by the use of only "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254. Instead, in a § 2255 case, a federal court asks whether the petitioner's sentence "was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255. Thus, a federal court has more leeway in § 2255 cases than § 2254 cases, because it is not constrained to use only clearly established federal law, as determined by the holdings of Supreme Court decisions. There is no Supreme Court case that holds that the *Sullivan* standard applies to cases of closely related successive representation. Thus, application of the *Sullivan* standard is inappropriate in such a case under § 2254. Third, this Court has held under almost identical factual circumstances that the case was one of successive representation. In *Gillard*, the attorney Martinez represented William Gillard in connection with a double murder. 445 F.3d at 890. The charges against William Gillard were dismissed. *Id.* at 891. The attorney Martinez then represented the petitioner, John Gillard, the brother of William. *Id.* Under such factual circumstances, this Court found that the attorney Martinez engaged in successive representation that was reviewed under the *Strickland* standard. *Id.* The instant case is factually indistinguishable, so that the *Strickland* standard is appropriate.

Under *Strickland*, the first element is whether O'Connell's performance was objectively deficient. Petitioner claims that O'Connell should have called Johnson as a witness at Petitioner's trial. Petitioner claims Johnson would have served two purposes at trial: (1) to deflect suspicion from Petitioner to Johnson as the murderer; and (2) to testify in favor of Petitioner, by stating that Johnson was not present with McBurroughs on April 22, 1996, that Johnson did not witness a shooting on April 22, 1996, that McBurroughs told Johnson several days after the shooting that McBurroughs did not know who shot the victim and that McBurroughs was not present when the victim was shot, and that O'Connell refused to allow Johnson to testify because of a conflict of interest.[3]

With respect to the first purpose, we find that O'Connell's performance was not objectively deficient for her failure to call Johnson so that Johnson could implicate himself or otherwise cast suspicion on himself when on the witness stand. There is no viable reason why Johnson would forgo his Fifth Amendment right against self-incrimination. We agree with the district court that if Johnson had been called by conflict-free counsel, Johnson would have most likely invoked his right against self-incrimination if asked questions whose answers would cast suspicion on Johnson.

The Second Circuit addressed a similar issue in *Eisemann v. Herbert*, 401 F.3d 102 (2d Cir. 2005). In that case, a father and son were charged with various counts of sexual abuse. *Id.* at 105. The father was charged with abusing a girl and her twin brother; the son was charged with abusing only the girl. *Id.* The father and son hired the same attorney, Holtman. *Id.* In 1985, the father pled guilty to the charges. *Id.* The son went to trial, represented by Holtman and another attorney. *Id.*

---

[3] With respect to the second purpose, Petitioner submitted an affidavit from Johnson that stated the underlying facts. Although Johnson purportedly swore out this affidavit, Johnson did not appear at the evidentiary hearing conducted by the state trial court, even though he was subpoenaed. The significance of these facts will be explained *infra*.

The jury found the son guilty on several charges. *Id.* On federal habeas review, the son argued that his counsel provided ineffective assistance, as a conflict of interest prevented counsel from calling the father to testify that he had committed the acts of which the son was accused. *Id.* at 108. The Second Circuit disagreed. The court first found that what the father would have testified to, had he been called as a witness, was unknown. *Id.* at 109. Moreover, if the father was asked about his own culpability as to the charges against the son, the father "would have had the protection of the privilege against self-incrimination, and nothing in the record suggests that he was willing to waive his privilege." *Id. See also Fletcher v. Mann*, No. 97-2137, 1998 WL 743744, at *4 (2d Cir. Oct. 21, 1998) (unpublished table opinion) (finding no ineffective assistance of counsel where the witnesses whom counsel failed to subpoena, who counsel also represented, "were virtually certain" to invoke the right against self-incrimination).

Likewise, it is highly speculative that Johnson would have incriminated himself or otherwise cast suspicion on himself, while at the same time decreasing the suspicion on Petitioner, if he testified at Petitioner's trial. Moreover, there is no reason to believe that Johnson would not have invoked his right against self-incrimination. We therefore hold that O'Connell's failure to call Johnson so that Johnson could deflect suspicion from Petitioner to Johnson was not objectively deficient performance.

The second purpose of Johnson's testimony, to impeach McBurroughs' testimony, is likewise unavailing. We first note that the only evidence that Johnson would have impeached McBurroughs' testimony is an affidavit purportedly from Johnson. This affidavit essentially asserts three points: (1) Johnson was not with McBurroughs on April 22, 1996; (2) Johnson did not witness a shooting on April 22, 1996; and (3) McBurroughs told Johnson several days after the shooting that McBurroughs did not know who shot the victim and that he was not present when the victim was shot. When conducting the evidentiary hearing with respect to Petitioner's claims of ineffective assistance of counsel, the state trial court specifically excluded this very same affidavit as inadmissible hearsay. Under Michigan law, the Michigan rules of evidence apply to all state court proceedings with only a few, enumerated exceptions, not one of which is an evidentiary hearing for a claim of ineffective assistance of counsel.[4] Mich. R. Evid. 1101. The state trial court thus did not consider the affidavit in its decision on Petitioner's ineffective assistance of counsel claim with respect to this purpose. Instead, the state trial court relied on the fact that Johnson did not testify at the evidentiary hearing even though he was subpoenaed. Because Johnson did not testify, the state trial court did not know "what Mr. Johnson would or would not have testified to." (J.A. at 909.) Likewise, the state court of appeals did not rely on the inadmissible affidavit in its decision on Petitioner's ineffective assistance of counsel claim. Like the state trial court, the state court of appeals noted that "there is no way of knowing what Johnson's testimony might have been since he did not appear for the hearing." *Stewart*, 2001 WL 1277451, at *2. Based on this fact, the state court of appeals found "that [Petitioner] has failed to meet his burden of demonstrating ineffective assistance of counsel. [Petitioner] has failed to show that Johnson would have offered any exculpatory testimony on his behalf at trial." *Id.*

The decisions of the state trial court and the state court of appeals on this point were not contrary to or an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Petitioner points to no Supreme Court decision that holds that a state court must consider inadmissible hearsay evidence when deciding a claim of ineffective assistance of counsel. The state courts' failure to consider the inadmissible hearsay affidavit of Johnson is simply not a basis for federal habeas relief. The conclusion of both the state trial court and the state court of appeals, that there was no *proper* evidence to support Petitioner's claim that Johnson would have impeached McBurroughs had O'Connell called Johnson as a witness at trial, was not contrary to or

---

[4]In Michigan, this is also known as a *Ginther* hearing. *See People v. Ginther*, 212 N.W.2d 922 (Mich. 1973).

an unreasonable application of clearly established law.  Petitioner's claim of ineffective assistance of counsel with respect to this second purpose of Johnson's testimony therefore fails.

Petitioner next claims that O'Connell provided ineffective assistance of counsel due to her failure to call Mateo as a witness at Petitioner's trial.  Here again, we conclude that Petitioner cannot demonstrate that his counsel's performance was deficient under the first *Strickland* prong.

Under *Strickland*, trial counsel has a duty to investigate his case:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91.

In preparation for trial, Petitioner asked O'Connell to contact Juan Mateo, an attorney whom Petitioner had contacted before Petitioner was arrested.  During one of his visits with Mateo, Petitioner allegedly brought McBurroughs with him, and McBurroughs allegedly made an exculpatory statement.  O'Connell did in fact contact Mateo to inquire as to whether Mateo should be called as a witness.  Mateo stated that he was unsure even if he could identify the person who made the exculpatory statement as McBurroughs.  Furthermore, Mateo did not have any written or recorded record of his conversation with the person who made the exculpatory statement.  Finally, Mateo did not recall the exact contents of the conversation with the person who made the exculpatory statement.  Specifically, Mateo testified at the evidentiary hearing that "[a]ll I recall from this witness is that he offered evidence that seemed to be exculpatory of Mr. Stewart.  In other words, it was evidence that either placed Mr. Stewart at a different location as an alibi witness or absolved Mr. Stewart being involved in the murder which was the underlying matter." (J.A. at 846.)  Petitioner believes that O'Connell's failure to call Mateo as a witness constituted ineffective assistance of counsel.  This argument lacks merit.

We initially note two points of agreement with Petitioner.  First, we agree that the fact that Mateo was unsure whether he could identify the person who made the exculpatory statement as McBurroughs is not an adequate basis to not call Mateo as a witness.  O'Connell could have shown a picture of McBurroughs to Mateo to see if he could have identified McBurroughs as said person.  Moreover, Mateo testified that he remembered that said person was a young African American male in a wheelchair, which is a description consistent with McBurroughs' description.  In short, O'Connell could have conducted further investigation into whether Mateo could in fact identify McBurroughs as the person who made the exculpatory statement.  Second, we also agree that Mateo's testimony would not have been inadmissible hearsay, because the statements would have been used not for the truth of the matter asserted, but to impeach McBurroughs' trial testimony.

We find, however, that O'Connell's failure to call Mateo as a witness was not objectively deficient performance because Mateo could not provide adequate testimony as to what this person, purportedly McBurroughs, said to Mateo.  Although Mateo had a vague recollection that the statement was exculpatory, Mateo was not sure in what way the statement was exculpatory.  Mateo testified at the evidentiary hearing that he had a recollection that the person was an alibi witness, although he was not sure; in contrast, Petitioner claims that McBurroughs recanted a police

statement. In our view, Mateo's vague testimony about an exculpatory statement would have been subject to appropriately severe cross-examination from the prosecution, which would have demonstrated that in fact Mateo did not remember what was said at that meeting. Under such circumstances, there was no legitimate purpose Mateo's testimony could have served, so that O'Connell's failure to call Mateo was not objectively deficient performance.

Petitioner raises two further claims of ineffective assistance of counsel: that O'Connell failed to file a proper notice of alibi witnesses, and that she failed to investigate Delshawn Williams as a potential witness. These two errors constitute deficient performance under *Strickland*'s first prong. An assessment of the totality of the omitted evidence shows that the unprofessional errors of counsel were prejudicial. We consider these errors in turn.

Under Michigan state law, if a defendant plans to offer an alibi as a defense, he must provide proper notice to the prosecution:

> If a defendant in a felony case proposes to offer in his defense testimony to establish an alibi at the time of the alleged offense, the defendant shall at the time of arraignment on the information or within 15 days after that arraignment but not less than 10 days before the trial of the case, or at such other time as the court directs, file and serve upon the prosecuting attorney a notice in writing of his intention to claim that defense. The notice shall contain, as particularly as is known to the defendant or the defendant's attorney, the names of witnesses to be called in behalf of the defendant to establish that defense. The defendant's notice *shall include specific information as to the place* at which the accused claims to have been at the time of the alleged offense.

Mich. Comp. Laws § 768.20(1) (emphasis supplied). "The trial court has the discretion to exclude alibi testimony when the defendant violates the notice provisions of M.C.L. § 768.20." *People v. Bieri*, No. 206707, 2000 WL 33421293, at *4 (Mich. Ct. App. May 9, 2000) (unpublished decision) (citations omitted).

As to the first prong of *Strickland*, O'Connell's failure to provide the location of the alibi fell below an objective standard of performance. Michigan law unequivocally requires the defendant to list the location of the alibi, as well as the names of the alibi witnesses. O'Connell, while providing the names of the alibi witnesses, did not give notice of the location of the alibi. The trial court had discretion to exclude the alibi witnesses, and it chose to do so by excluding two of the three alibi witnesses but allowing one alibi witness to testify.[5] An objectively reasonable attorney would have complied with Michigan law in providing the correct alibi notice. This is especially true because Petitioner's entire defense rested upon alibi. *See Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004) (finding objectively deficient performance where counsel failed to timely submit the notice of alibi and where alibi was "a critical aspect of a defendant's defense").

We next consider Petitioner's claim that O'Connell's failure to investigate Delshawn Williams as a potential witness constituted defective performance. Under *Strickland*, trial counsel has a duty to investigate his case:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words,

---

[5]While Petitioner claims that such exclusion was an abuse of discretion, this raises an issue separate from whether O'Connell provided ineffective assistance of counsel.

> counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91. "This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (citation omitted).

At Petitioner's trial, Simpson testified that he was at a friend's house on April 22, 1996. Simpson testified that he was visiting his friend Marvin, who is Marvin Williams, Delshawn Williams' brother. Marvin Williams and Delshawn Williams live at the same house. He testified that Petitioner, shortly before the time of the shooting, entered the house, asked Simpson if Simpson knew where the victim was, threatened to kill the victim, and then left with Johnson and McBurroughs in a black Chevy Impala.

At the evidentiary hearing, Petitioner testified that before trial, he read Simpson's statement, and he contacted Williams through Petitioner's brother. Petitioner asked O'Connell to subpoena Williams, so that Williams could testify that Petitioner was not at Williams' house on April 22, 1996. At the evidentiary hearing, Williams testified that O'Connell never contacted him about Petitioner's case, and he was never subpoenaed to testify at Petitioner's trial. Williams also testified that on April 22, 1996, Simpson was never at Williams' home, contrary to Simpson's testimony at Petitioner's trial. Williams testified that he did not find out about the content of Simpson's testimony until after Petitioner's trial was finished.

The uncontested evidence in the record is that O'Connell failed to adequately investigate Simpson's statement, and she failed to adequately investigate Williams as suggested by Petitioner. In either case, it seems clear that O'Connell should have, at some point, contacted Williams, one of the individuals who lived in the house where Simpson purportedly had the conversation with Petitioner on April 22, 1996. This failure to investigate clearly constituted objectively deficient performance. Simpson was a major witness against Petitioner, as he testified that Petitioner threatened to kill the victim shortly before the victim was shot and killed. Even a superficial investigation would have led to the house where this conversation purportedly took place, and such investigation would have led directly to Williams. Moreover, Petitioner specifically told O'Connell to subpoena Williams. We can see no strategic purpose in failing to investigate Williams as a potential favorable witness. As this Court stated: "Where counsel fails to investigate and interview promising witnesses, and therefore 'ha[s] no reason to believe they would not be valuable in securing [defendant's] release,' counsel's inaction constitutes negligence, not trial strategy." *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992) (quoting *United States ex rel. Cosey v. Wolff*, 727 F.2d 656, 658 n.3 (7th Cir. 1984)). *See also Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) ("Counsel did not make any attempt to investigate this known lead, nor did he even make a reasoned professional judgment that for some reason investigation was not necessary.").

The state court reasoned that O'Connell's failure to contact Williams was not deficient performance, because Williams testified at the evidentiary hearing that he did not step forward earlier with his information because he was "neutral" and "didn't want to get involved" because he knew both Petitioner and the victim. (J.A. at 831-32.) The state court stated:

> We agree with the trial court that counsel was not ineffective for not calling Williams as a witness because Williams stated that he did not come forward as a witness and did not want to be involved. Counsel cannot be faulted where the potential witness clearly did not want to be involved in the case and did not come forward with any

> testimony.  Therefore, defendant has not shown that counsel was deficient for not
> calling Williams as a witness at trial.

*Stewart*, 2001 WL 1277451, at *3.  This argument rests on an unreasonable application of the *Strickland* standard to the facts of this case.  *See Williams*, 529 U.S. at 413.  First, the fact that Williams was unwilling to step forward with this information on his own does not mean that Williams was unwilling to testify that Simpson was not at Williams' house on April 22, 1996.  In fact, Williams testified that he gave a statement to another, unknown lawyer.  In our view, this fact indicates that Williams most likely would have testified at Petitioner's trial consistent with his testimony at the evidentiary hearing.  Second, as noted by Petitioner, even if Williams was in fact reluctant to testify, O'Connell had no way of knowing this, as she never spoke with Williams.  Third, even if Williams was reluctant to testify, the state trial court could have issued a subpoena and compelled Williams to testify.  Perhaps most telling is that the state court subpoenaed Williams to testify at the evidentiary hearing, Williams appeared before the state court, and Williams testified that Simpson was not at his house on the day the shooting occurred, even though Williams was reluctant to come forward on his own.  There is absolutely no reason to believe that Williams would have acted any differently had he been subpoenaed to testify at trial, as Petitioner requested from O'Connell.  In short, there is simply no excuse for O'Connell's failure to investigate Williams and her consequent failure to secure his testimony on behalf of Petitioner.

We believe that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  These two errors of counsel went to the very heart of Petitioner's defense, namely, that when the crime was committed, he was not even in the state.

We turn first to the alibi witnesses.  The state court of appeals found that Petitioner had suffered no prejudice from O'Connell's failure to provide the proper alibi notice because the trial court had permitted one of these witnesses to testify and the testimony of the other two would have been cumulative.  We disagree.

In *Washington v. Smith*, 219 F.3d 620 (7th Cir. 2000), the Seventh Circuit held that the testimony of several alibi witnesses was not cumulative:

> Gola Richardson, Sharon Brown, David Brown and Jerome Pickens [the four potential alibi witnesses] were with [the petitioner] at 24th and Vine at about the time the Jolly Skot was robbed.  Jerome Pickens was the only one of these to testify, corroborating [the petitioner's] story, but Pickens's credibility was impaired because of his prior convictions.  The impact of three more witnesses corroborating [the petitioner's] alibi would not have been "cumulative" as the Wisconsin Court of Appeals believed.  Evidence is cumulative when it "supports a fact established by existing evidence," Black's Law Dictionary 577 (7th ed. 1999), but Washington's whereabouts on the day of the robbery was far from established–it was *the* issue in the case.  The fact that Pickens had already testified to facts consistent with [the petitioner's] alibi did not render additional testimony cumulative.  Indeed, the additional testimony of Gola Richardson, Sharon Brown and David Brown–none of whom could have been impeached as having a criminal record–would have added a great deal of substance and credibility to [the petitioner's] alibi.  *See Montgomery v. Petersen*, 846 F.2d 407, 411-15 (7th Cir.1988) (finding counsel ineffective for not calling additional disinterested alibi witnesses not subject to the same impeachment as family members); *Crisp v. Duckworth*, 743 F.2d 580, 585 (7th Cir.1984) (finding that "[h]aving independent witnesses corroborate a defendant's story may be essential" and "testimony of additional witnesses cannot automatically be categorized as cumulative").  Rather than one direct alibi witness with a criminal

record, [the petitioner] could have had three potentially more credible witnesses, all of whom would have supported his claim that he was at Gola Richardson's when the Jolly Skot was robbed.

*Id.* at 634 (seventh alteration in the original). Of particular note was that the jury anticipated more than one alibi witness, considering the substance of the alibi:

Plus, the jury surely wondered where these people were, especially Ms. Richardson who had been named on [the petitioner's] Notice of Alibi and who Mr. Engle specifically mentioned at least at voir dire. There was a negative inference against [the petitioner] based on their absence. . . . Given the absence of these witnesses, the jury had good reason to find [the petitioner's] alibi dubious.

In a similar case in this circuit, we held that the testimony of several alibi witnesses was not cumulative. In *Bigelow v. Williams*, the petitioner's counsel failed to investigate the possibility of other alibi witnesses after one disinterested alibi witness surfaced. 367 F.3d 562, 565 (6th Cir. 2004). The one alibi witness' testimony was vulnerable because he had worked at the alibi location where he saw the petitioner on two consecutive days; thus the prosecution could create doubt that the alibi witness had in fact seen the petitioner on the day the crime occurred. *Id.* Had counsel investigated, counsel would most likely have found three additional alibi witnesses, who would not have had such vulnerability. *Id.* at 565-66. The state court found that the testimony of the three additional witnesses would have been cumulative, and this Court disagreed:

This evidence plainly would have bolstered [the petitioner's] defense and was anything but cumulative. . . . [The petitioner] had just one witness at trial (Greenlee) who could support his alibi defense. Doubtless, three other witnesses, who like Greenlee did not previously know [the petitioner] and accordingly had no axe to grind in testifying on his behalf, would have aided the defense. This testimony also would have shored up the weaknesses in Greenlee's testimony . . . .

*Id.* at 575.

Likewise, in *Clinkscale*, this Court granted the petitioner habeas relief after his counsel failed to timely submit a notice of alibi. 375 F.3d at 445. The petitioner, testifying in his own defense at trial, stated that he could not have committed the crime of which he was accused because he was one hundred seventy miles away at the time. *Id.* at 433. Although there were three people who could have corroborated the alibi, defense counsel failed to timely file a notice of alibi, and the trial court refused to allow the testimony of the three alibi witnesses. *Id.* at 434-35. Thus, the only evidence of the alibi was the petitioner's testimony, which was uncorroborated. In finding ineffective assistance of counsel, this Court stated:

As it was, Clinkscale's only meaningful defense–for which no evidence other than his own testimony was deemed admissible–was that he could not have committed the crimes as charged because he was in Youngstown at the time with his close friend, Bryan Fortner, his girlfriend, Rhonda Clark, and his father, Arthur Clinkscale. The fact that none of these individuals could provide any corroboration for this alleged alibi certainly must have significantly affected the jury's assessment of Clinkscale's guilt. Had even one alibi witness been permitted to testify on Clinkscale's behalf, Clinkscale's own testimony would have appeared more credible because it coincided in important respects with those of his alibi witness[(es)]. . . . [W]ithout any corroborating witnesses, however, Clinkscale's testimony left him without any effective defense.

*Id.* at 445 (alterations in the original) (internal quotation marks and citations omitted).

        Based on this case law, we find that the excluded testimony of Hill and Foster was not "cumulative," so that Petitioner did suffer prejudice from O'Connell's failure to submit a proper alibi notice. As noted by the Seventh Circuit, "[e]vidence is cumulative when it 'supports a fact established by existing evidence,' Black's Law Dictionary 577 (7th ed. 1999)," but in the instant case, Petitioner's alibi defense was hardly established by the sole testimony of Ziegler. *Washington*, 219 F.3d at 634. The testimony of Hill and Foster "would have added a great deal of substance and credibility to" Petitioner's alibi defense. *Id.* This is especially true because Ziegler, the alibi witness who did testify, was impeached with the fact that he allowed Petitioner to use Ziegler's address in Petitioner's application for a Michigan driver's license under an assumed name. Moreover, even though Hill and Foster were friends with Petitioner, they were also friends with the victim. Rather than one alibi witness who had been impeached, Petitioner would have had two more credible witnesses who would have supported that he could not have committed the murder.

        One fact that we note is of particular importance is that the prosecution emphasized the lack of other alibi witnesses during the cross-examination of Ziegler:

> Q:      Now, you say Mr. William Foster and Mr. Gerald Hill, they were with you also, is that correct?
>
> A:      Yes.
>
> Q:      Are they here in court?
>
> Ms. O'Connell:          Objection, your Honor, as to relevancy.
>
> The Court:     Well, how is it relevant, Mr. Prosecutor?
>
> Mr. Wagner:    Your Honor, if he's saying this and he's with some other people, I want to know if they can corroborate what he's saying.

(J.A. at 506.) Amazingly, the prosecution made this comment after the state trial judge had already ruled, outside of the jury's presence, that Hill and Foster could not testify, so they were prevented from corroborating Ziegler's testimony. In our view, a natural question that a juror would have in hearing Ziegler's testimony was whether Hill and Foster were going to testify, considering that Ziegler placed Hill and Foster with Petitioner on April 22, 1996. This question was further impressed in the juror's mind when the prosecution explicitly stated that if Ziegler's testimony were true, Hill and Foster would be able to corroborate that testimony, which the prosecution knew Hill and Foster were prevented from doing. When Hill and Foster did not testify, as the state trial court disallowed their testimony, "the jury had good reason to find [Petitioner's] alibi dubious." *Washington*, 219 F.3d at 634. Like the petitioner in *Clinkscale*, Petitioner was forced to present uncorroborated testimony for his only defense, alibi, and this lack of corroboration "must have significantly affected the jury's assessment of" Petitioner's guilt. 375 F.3d at 445.

        The ultimate question on the issue of prejudice is whether, but for O'Connell's objectively deficient performance, there was a reasonable probability of a different result at trial:

> A reasonable probability is a probability sufficient to undermine confidence in the outcome, . . . but something less than a showing that the outcome more likely than not would have been different . . . . While the petitioner need not conclusively demonstrate his actual innocence, . . . the focus should be on whether the result of the trial was fundamentally unfair or unreliable . . . .

*Bigelow*, 367 F.3d at 570 (internal quotation marks and citations omitted). Petitioner's entire defense strategy was an alibi defense. Due to O'Connell's failure to submit a proper alibi notice,

Petitioner was able to present only one alibi witness, who was impeached with information that could not have been used against the other two excluded alibi witnesses. Petitioner's alibi defense was doomed to failure, as the jury expected to hear from Hill and Foster to corroborate Ziegler's testimony, an expectation that the prosecution assisted in cultivating. When Hill and Foster did not testify, as the state trial court, outside the presence of the jury, excluded their testimony, the jury would naturally assume that Ziegler's testimony lacked reliability. The jury had no idea that Hill and Foster's failure to testify was caused by the state trial court's exclusion, as opposed to Hill and Foster's unwillingness or inability to corroborate Ziegler's testimony.

O'Connell's error in failing to investigate the witness Delshawn Williams compounded the prejudice suffered as a result of the lack of the alibi witness. Simpson was a key witness for the prosecution, as the state court of appeals admitted. *Stewart*, 2001 WL 1277451, at *1. Simpson provided critical testimony that, shortly before the victim was shot and killed, Simpson was at Williams' house, and Petitioner arrived at the house, asking about the location of the victim and threatening to kill the victim. Simpson testified that Petitioner left the house with Johnson and McBurroughs. Shortly after their departure, the victim was shot and killed. Williams' testimony would have cast substantial doubt as to Simpson's testimony, as Williams would have testified that Simpson was not at Williams' house on April 22, 1996, nor was Petitioner.

Because O'Connell failed to investigate and call Williams as a witness, the questionable testimony of Simpson was allowed to go unchallenged. Simpson's testimony was significant in four respects: (1) it corroborated the testimony of McBurroughs, a purported eyewitness to the shooting, that Petitioner, McBurroughs, and Johnson were together on the day of the shooting, thus lending credibility to the whole of McBurroughs' testimony; (2) it provided the only semblance of motive evidence, as Simpson testified that Petitioner was angry and threatened to kill the victim, even though Petitioner and the victim were friends and no other witness was able to testify as to any problems between Petitioner and the victim; (3) it provided the only evidence of the element of premeditation under first degree murder; and (4) it was evidence of identity, as Simpson identified Petitioner as threatening to kill the victim, and the victim was fatally shot shortly thereafter. McBurroughs' testimony and Simpson's testimony were the twin pillars of the prosecution's case, and the testimony of one bolstered the testimony of the other. Consequently, but for O'Connell's failure to challenge Simpson's testimony via Williams, there is a reasonable probability of a different outcome for Petitioner's case.

When determining prejudice, the Court must consider the errors of counsel in total, against the totality of the evidence in the case. *See Strickland*, 466 U.S. at 695-96 ("In making [the prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. . . . Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."). In the instant case, had O'Connell provided effective assistance, Williams would have severely undercut the testimony of Simpson, and Williams would have been a credible witness, considering that he was friends with both Petitioner and the victim. Moreover, Hill and Foster would have bolstered the viability of Petitioner's alibi defense, and they too would have been credible, considering their friendship with both Petitioner and the victim. The prosecution would have been left with the uncorroborated testimony of McBurroughs and the testimony of the victim's brother, who could not even identify the shooter, against Petitioner's three alibi witnesses, who would have testified that Petitioner could not have committed the crime. The difference between the case that was and the case that should have been is undeniable. We therefore hold that the state court's finding that Petitioner's counsel was "not ineffective" was "objectively unreasonable" in light of the facts in this case. *See Brown v. Payton*, 544 U.S. 133, 147 (2005).

## III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the order of the district court and **GRANT** the petition for writ of habeas corpus.  The district court shall enter an order requiring Petitioner to be released from custody unless the State of Michigan commences a new trial within 180 days of the district court's order.