**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0154n.06

Nos. 08-5156/ 08-5157

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Mar 16, 2011**
LEONARD GREEN, Clerk

| | |
|---|---|
| RANDY CALDWELL, | ) |
| STEVIE CALDWELL, | ) |
| | ) ON APPEAL FROM THE |
| Petitioners-Appellants, | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE MIDDLE |
| v. | ) DISTRICT OF TENNESSEE |
| | ) |
| VIRGINIA LEWIS, Warden | ) |
| | ) |
| Respondent-Appellee. | ) |

Before:     KEITH, CLAY, and GRIFFIN, Circuit Judges.

**DAMON J. KEITH, Circuit Judge.**  Stevie and Randy Caldwell appeal the district court's

denial of their petitions for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, following their

convictions for conspiracy to commit arson, aggravated arson, and first-degree felony murder in

Kentucky state court.  The Caldwells argue that they were provided ineffective assistance of counsel

because trial counsel failed to call alibi witnesses at trial despite promising the jury that these

witnesses would testify at trial.  For the reasons discussed below, the district court's determination

is **REVERSED**.

**I. BACKGROUND**

**A. Facts**

On December 7, 1994, Timmy Dildine heard Luther Gist tell Wayne Cunningham

("Wayne"), "I want my goddamn money, or I will blow your head off."  Gist and Wayne lived in

rural Tennessee on Gum Springs Mountain. Gist lived in an old structure that was heated by wood, which lacked indoor plumbing. Around 1:00 a.m. on December 8, 1994, Gist's home caught fire. Gist, inside the home, died from smoke inhalation as the home burned to the ground. Wayne had a sixteen-year-old son, Lester Cunningham ("Lester"), whose nickname was "Boss" or "Boss Hog." Although there was no evidence that the fire was caused by arson, police suspected that Lester had played a role in burning Gist's home. After Lester denied any involvement, police offered him nonprosecution in exchange for a confession. Under that agreement, he claimed that he witnessed Stevie and Randy Caldwell deliberately set Gist's home on fire.

The Caldwells provided a different account of the evening's events to the police. Stevie Caldwell and his wife, Bridgett Caldwell, lived with Randy and his wife, Gayle Caldwell, at the foot of Gum Springs Mountain. The Caldwells told police that Stevie and Randy were home the night of the fire—first fighting chickens with Lester, and later sleeping in their respective beds—until a relative called them to report the Gist fire. Stevie, who received Supplemental Security Income ("SSI") mental disability benefits and may not have been able to tell time, said that he thought the call came at about 3:30 a.m. The others said the call came at about 6:00 a.m.

Lester's version of the evening changed on several occasions. He initially claimed that he was sleeping on the Caldwells' couch during the fire. He subsequently changed his story, claiming that he, Stevie, and Randy had caused the fire. He changed his story again, in January 1995, when he gave defense counsel an audiotaped statement in which he denied involvement with the fire and stated that he, Stevie, and Randy were at the Caldwells' home all night. He also explained in detail how police had used scare tactics to force his confession: "They told me that I had to tell them that

2

Randy and Stevie was up there, that we was all up there, that Randy went around the house and Stevie went around the side of the house and that they all took off. . . . [I said it] because they told me to and the way they were pressuring me, I mean, I wasn't going to get my ass kicked." At trial, Lester testified that the Caldwells were involved in starting the fire. After trial, Lester went to defense counsel and stated that his trial testimony was perjured, and the Caldwells were not involved in starting the fire. Lester soon vacillated again and stated that his trial testimony was in fact truthful.

Defense counsel identified multiple witnesses who contradicted Lester's inculpatory story. The Caldwells' trial attorneys filed notices of an alibi defense, indicating that they planned to rely upon the Caldwells' wives, Bridgett (Stevie's wife) and Gayle (Randy's wife), to testify about their whereabouts from 10 p.m. until 6 a.m. Stevie's attorney, Hilton Conger ("Conger"), prepared the wives to testify to the alibi during a mock trial, and prepared other witnesses as well, including the Caldwells' mother and father. The wives provided a complete alibi; the father placed Stevie and Randy at home about an hour before the fire. Conger stated that he had no reason to disbelieve the wives, and that he had not uncovered any character evidence that would damage them. Conger was also aware of another defense witness, Timmy Dildine, the man who heard Gist demanding payment of a debt from Lester's father, Wayne, on the day of the fire.

The government gathered evidence to support Lester's story that he and the Caldwells started the Gist fire. The government obtained the testimony of Linville Roberts ("Roberts"), an elderly woman who lived approximately ten-to-fifteen minutes walking distance from Gist's house. Roberts reported that Stevie and Lester had come to her house at about 3:00 a.m., which was more than an

3

hour after the fire was spotted. According to Roberts, Stevie and Lester told her that their car had run out of gas, and they then used her phone to call relatives. She stated that they rested in her living room until daylight and then left walking. The government also gathered the following evidence: 1) a lighter in Stevie's possession on December 8, 1994; 2) two jugs with kerosene residue in Randy's car; and 3) testimony that around 2:00 a.m. on the night of the fire, two of Gist's neighbors heard a car with a loud muffler — a condition that is common to many cars in the area, including Randy's car.

On August 29, 1995, the government tried the Caldwell brothers jointly for arson-related charges and for the felony-murder of Gist. It dropped its charges against Lester. No physical evidence was presented to show that the fire was caused by arson. No fire marshal reports were presented, and there was no evidence that the Caldwells had a motive to burn Gist's house.

The state's chief witness was Lester, who provided the following testimony. After fighting chickens at the Caldwell house, he, Stevie, and Randy left the house at about 11:15 p.m. in Randy's car. They went to Gist's home, and spontaneously decided to burn some hay bales. The Caldwells then decided to burn the house instead of hay, using Stevie's lighter and a jug of gasoline from Randy's car. After setting Gist's house on fire, they left in Randy's car and stopped to watch the fire. Lester and Stevie walked to get a closer look; Randy drove off. Lester and Stevie walked for two to three hours in the woods until they arrived at Roberts's house. They used her phone to call Randy, who picked them up nearby.

Lester was cross-examined about his previous, contradictory statements that exculpated the Caldwells, and he testified that he had previously lied because of pressure from the Caldwells. The

4

government also presented the testimony of Roberts. Roberts was not cross-examined about a recorded statement that she gave the police in which she stated that Stevie and Lester were not responsible for the fire, but rather, other people were the culprits.

According to Stevie's trial counsel, Conger, the intended focus of the defense was to undermine Lester's incredible testimony with the Caldwells' alibi. In his opening statement to the jury, Conger promised to provide an alibi for the Caldwells. He told the jury that Stevie and Randy were home in bed during the fire. Then he asserted, "Now our witnesses to that are their wives." Despite this assertion, and despite having witnesses who were prepared to testify, defense counsel put on no proof. In its closing argument, the government emphasized that it had Roberts on its side, and that she was testifying in rough accord with Lester. In closing, Conger reminded the jury that he did not bring the promised alibi witnesses, stating "[w]e certainly could have called witnesses up."

**B. Procedural Background**

After a two-day trial, the jury deliberated for two hours and found the Caldwells guilty of three charges, including aggravated arson, conspiracy to commit arson, and felony murder. The court imposed on each defendant an effective sentence of life in prison. The Caldwells filed postconviction petitions alleging that they received ineffective assistance of counsel. Both Hilton Conger (Stevie's lawyer) and Chris Cantrell (Randy's lawyer) testified at the state court evidentiary hearing convened to address the Caldwells' postconviction petitions.

The hearing focused on the attorneys' failure to put on any proof at trial, with particular emphasis on their failure to call certain key witnesses to testify as to the alibi defense and alternate

theory of the crime. In explaining why he decided to withhold the alibi witnesses, Conger explained that he believed that "we were in as good a position that we could be in." Conger felt that they were in an optimal position because he thought he and Randy's attorney had "completely discredited" Lester. Conger testified that both wives were available to testify as well as Stevie's father, William Caldwell, who would have provided a partial alibi. He also testified that he had no reason to disbelieve either wife. Conger testified that he was aware at trial that Dildine was prepared to testify that Gist had threatened to kill Lester's father, Wayne, over a money dispute shortly before the fire. The only reason he gave for not putting Dildine on the stand was "we were never able to locate Wayne Cunningham and verify the story." Dildine's story would have tended to draw suspicion upon Wayne himself.

At the postconviction hearing, Gayle Caldwell testified that she did not know of either Stevie or Randy leaving the house on the night of the fire. She stated that she and Randy went to bed at about 12:30 a.m., that she was awakened at 2:00 a.m. by relatives looking for coon dogs, and that she actually saw Randy in bed at this time. She stated that she did not know of him leaving the bed between 12:30 a.m. and 2:00 a.m. Stevie also testified that he was at home at the time in question. Bridgett Caldwell similarly testified that she would have testified at trial that Stevie was with her all night, with the exception of a fifteen-minute trip to the store prior to the time of the fire. She reported that she was present at the trial, and that she was "prepared to take an oath and swear that [the alibi] was the truth."

However, she also declared that the alibi testimony that she would have given at trial would have been false because Stevie was absent from the house on the night of the fire. Bridgett divorced

6

Stevie in 1997, after trial but before the postconviction hearing. At the time of the postconviction hearing, Timmy Dildine was engaged to marry Bridgett, and animosity may have developed between Dildine and Stevie. Dildine confirmed that in a store on Gum Springs Mountain the day before the fire, he heard Gist threaten Lester's father over money. He also confirmed that he told both defense attorneys before trial about this threat, gave them a statement, and was present to testify at trial but was not called.

The postconviction trial court denied relief from the bench without making a credibility determination. The court found that it was reasonable for defense counsel to decline to use any of the favorable witnesses and stated: "I think courts generally hold that, unless the testimony of a witness sought to be impeached was so important to the issue, and the evidence of the impeaching witness so strong and convicting that a different result would necessarily follow is quite a burden to carry in a case like this after the fact and after the verdict has been returned."

The Tennessee Court of Criminal Appeals ("TCCA") denied the Caldwells' appeal on September 30, 1997. *See generally State v. Caldwell*, 977 S.W. 2d 110 (Tenn. Crim. App. 1997). The TCCA credited the trial attorneys' testimony. The TCCA said their decisionmaking was sound because through cross-examination, they had elicited testimony from Investigator Guy Goff that the wives had told him that their husbands were at home all night. Neither attorney provided this explanation during the evidentiary hearing. The TCCA also found that both attorneys had misgivings about the wives' capacity as witnesses although they did not question their credibility. The TCCA further noted that the Caldwells' father could not provide an alibi for the precise time period needed. With respect to Dildine, the TCCA noted that Conger was unable to contact Wayne

7

to confirm Dildine's story.  Thereafter, the Tennessee Supreme Court denied the Caldwells' applications for review.

The Caldwells petitioned for writs of habeas corpus in the United States District Court for the Middle District of Tennessee on January 26, 2005.  The district court ruled solely on the state court record, but ruled as if the record established that Gayle Caldwell lied at the postconviction hearing, Stevie Caldwell lied at the postconviciton hearing, Bridgett Caldwell told the truth at the postconviction hearing when she testified that the alibi was false, and that Bridgett Caldwell would have testified at trial that the alibi was false.  These assumptions are captured in the following statement:  "If Bridgett Caldwell had been called as an alibi witness and given her truthful statements, then the results for the Petitioner and their other family witnesses would have been disastrous."  The district court denied relief on January 10, 2008.  This timely appeal followed.

## II.  ANALYSIS

### A.  Certificate of Appealability

We begin by clarifying the certificate of appealability. On January 22, 2008, Stevie moved for a certificate of appealability before the district court for a single issue:  "Whether he is entitled to relief on the merits of his claim, under *Strickland v. Washington*, that his trial counsel provided constitutionally ineffective assistance by failing to present the jury with testimony of certain defense witnesses, namely Bridgett Caldwell, Gayle Caldwell, William Caldwell, and Timmy Dildine?" Randy filed a nearly identical motion on January 23, 2008.  The district court granted the motions on January 25, 2008, but inexplicably tied the motions to: "*Petitioner's claim* that their [sic] counsel's failure to call at trial defense witnesses whom counsel referred to an opening argument is

***per se***, ineffective assistance of counsel." (emphasis added). Neither Stevie nor Randy ever presented a *per se* ineffective assistance of counsel claim at any point to the district court, and the district court's denial of their petitions for writ of habeas corpus addressed a *Strickland* claim for ineffective assistance of counsel, not a *per se* claim.

Most ineffective assistance of counsel claims arise under *Strickland v. Washington* and require a showing that (1) counsel's performance was deficient, and (2) there was prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Fewer claims arise under *United States v. Cronic*, 466 U.S. 648 (1984), and are labeled "*per se*" claims.

> The Supreme Court has held that under certain egregious circumstances, however, a defendant can assert a 'per se' ineffective assistance claim in which the court will presume prejudice. Those circumstances include the actual or constructive denial of assistance 'when counsel was either totally absent or prevented from assisting the accused during a critical stage of the proceeding.'
>
> *Short v. United States*, 471 F.3d 686, 693 (6th Cir. 2006) (citing *Cronic*, 466 U.S. 658-59).

*Per se* claims are generally harder to prove than *Strickland* claims and apply to especially egregious behavior by counsel. *See Moss v. Hofbauer*, 286 F.3d 851, 859-60 (6th Cir. 2002) (noting that *per se* claims require proof of the "complete absence of counsel" while *Strickland* claims require an "individualized inquiry into defense counsel's performance").

It is not clear why the certificate of appealability states that it relates to a *per se* claim of ineffective assistance of counsel when the motion requested a certificate of appealability on the *Strickland* claim. The district court stated that it was granting the certificate of appealability for the single issue that the Caldwells sought to appeal, yet misstated the issue and inadvertently imposed a more stringent standard on Petitioners.

To obtain a certificate of appealability ("COA"), a petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (citation omitted). "[A] COA does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief." *Id.* at 337. It is sufficient for Petitioners to demonstrate that "the issues presented are adequate to deserve encouragement to proceed further." *Savoca v. United States*, 567 F.3d 802, 803 (6th Cir. 2009) (citations omitted). Because a COA was granted for the more stringent *per se* claim, one should have been granted for the *Strickland* claims. It is illogical to intentionally grant a COA for the *per se* claim and not a *Strickland* claim. Moreover, for the reasons discussed below, the Caldwells' *Strickland* claims raise a debatable issue.

The Caldwells filed a Motion to Expand the Certificate of Appealability to include the *Strickland* claims on October 30, 2008. The motion to expand was initially denied by this Court. Nonetheless, this Court retains discretion to hear the *Strickland* issue on appeal. *See Humphreys v. United States*, 238 F. App'x 134, 139 (6th Cir. 2007) (noting that the court of appeals may expand a certificate of appealability issued by a district court); *Mack v. Holt*, 62 F. App'x 577, 578 (6th Cir. 2003) (expanding certificate of appealability *sua sponte* to consider an additional issue). To hear an issue on appeal, "a circuit justice or judge [must] issue[] a certificate of appealability" for an appeal of a "final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." 22 U.S.C. § 2253(c)(1). The *Strickland* claim was the only ineffective assistance of counsel claim raised in the Caldwells' federal petition for writ of habeas

10

corpus. Because it seems clear that the district court intended to grant the Caldwells' motion for certificate of appealability for the issue that they were contesting—the *Strickland* claim—the certificate of appealability is clarified to address this issue.

## B. Merits

"When reviewing the decision of a district court on a petition for habeas relief, this Court reviews the legal conclusions *de novo* and the factual conclusions for clear error." *See Stewart v. Wolfenbarger*, 468 F.3d 338, 346 (6th Cir. 2006). "[F]ederal courts may not grant habeas relief to a state prisoner unless the state court's adjudication of his claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Stuart v. Wilson*, 442 F.3d 506, 514-15 (6th Cir. 2006) (internal quotation marks omitted). There is an unreasonable application of federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

The Sixth Amendment requires that all criminal defendants receive reasonably effective assistance of counsel. *See Strickland*, 466 U.S. at 688. To prove ineffective of assistance of counsel under *Strickland*, the Caldwells must show that (1) counsel's performance was deficient, and (2) they suffered prejudice, which means that "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Id.* at 687. "[C]ounsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.* at 690.

11

1. *Deficient Performance*

"[A]n attorney's failure to present available exculpatory evidence is ordinarily deficient, unless some cogent tactical or other consideration justified it." *Pavel v. Hollins*, 261 F.3d 210, 220 (2d Cir. 2001) (quoting *Griffin v. Warden*, 970 F.2d 1355, 1358 (4th Cir. 1992)) (internal quotation marks omitted). *See also Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) (holding that failure to properly pursue a potential alibi defense "constituted ineffective representation outside the wide range of professionally competent assistance"); *Towns v. Smith*, 395 F.3d 251, 258-61 (6th Cir. 2005) (counsel provided ineffective assistance by failing to properly pursue a potential favorable defense witness). Conger gave one reason for not producing the promised proof of alibi: he thought Lester had been completely discredited on cross-examination. This reason was not sound. The government produced two main witnesses, Lester and Roberts. The government's case relied in large part on Roberts's testimony. Even if Lester had been completely discredited, trial counsel's cross-examination of Lester had no effect on Roberts's testimony. With respect to Dildine, the alternative theory witness, Conger explained that he withheld his testimony because he could not confirm with Wayne that Dildine's story was true. However, Wayne would have been reluctant to draw suspicion upon himself by admitting that he and Gist argued over money the night of the fire. Both trial counsel acknowledged that the Caldwells' defense strategy was to discredit Lester, if he testified against the Caldwells, and produce evidence of an alibi. By this calculation, counsel failed to provide the defense that they strategically intended by failing to produce alibi witnesses.

Counsel's explanations do not provide a tactical justification for their failure to have these witnesses testify at trial. The defense put on no proof despite promising the jury that they would hear

12

from alibi witnesses. While Cantrell (Randy's attorney) acknowledged that Bridgett would be a better witness than Gayle, he acknowledged that he found both witnesses to be credible and believable. Conger expressed no misgivings about either witness and repeatedly stated that he thought they were credible.

In determining whether the attorneys' performance was deficient, the TCCA provided tactical reasons different the ones given by trial counsel. The TCCA found that counsel's decision to withhold favorable witnesses was sound strategy because Investigator Goff testified on cross-examination that the wives had once told him that their husbands were at home in bed at the time of fire. The TCCA further noted that "[b]oth attorneys had misgivings about the wives' capability as witnesses." These findings were an unreasonable application of the *Strickland* factors to this case. *See Williams*, 529 U.S. at 413.

To properly evaluate counsel's tactical reasons for trial conduct, the reviewing court must "reconstruct the circumstances of counsel's challenged conduct, and . . . evaluate the conduct from counsel's perspective at the time" of trial. *Strickland*, 466 U.S. at 689; *see also Pavel*, 261 F.3d at 217 n.9 (the focus "must be on the reasonableness of decisions when they were made, not on how reasonable those decisions seem in retrospect."). "Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *David v. Lambert*, 388 F.3d 1052, 1064 (7th Cir. 2004) (quoting *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990)). The TCCA's reasons are invalid because they were not the tactical decisions of counsel; they were fabricated by the TCCA with the benefit of hindsight. Hilton Conger expressed no misgivings about the wives' ability to perform at

13

trial, and both Conger and Cantrell stated that they found the wives credible and believable. Although Bridgett subsequently changed her story at the postconviction hearing, both she and Gayle stated that they would have provided a full alibi for the Caldwells if they had been called at trial. Given the attorneys' promise to present them during opening statements to the jury, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Despite the TCCA's misapplication of federal law, the district court accepted its rationales, and added its own factual conclusions. The district court created its own tactical excuse for Conger's failure to provide these witnesses by finding that Bridgett was likely to testify at trial that the alibi was false, and that the alibi was in fact false. The court claimed that "[i]f Bridgett Caldwell had been called as an alibi witness and given her truthful statements, then the results for the Petitioner and their other family witnesses would have been disastrous."

The district court improperly determined that Bridgett's testimony was false. The state courts did not make a determination about whether Bridgett's testimony would have been false. Federal courts cannot determine a genuine issue of material fact which depends upon a witness's credibility without hearing the relevant testimony. *See United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("courts must always be sensitive to the problems of making credibility determination on the cold record."). "[O]ur Constitution leaves it to jury, not the judge, to evaluate the credibility of witnesses in deciding a criminal defendant's guilt or innocence." *Ramonez v. Berghuis*, 490 F.3d 482, 490 (6th Cir. 2007). If the alibis were in fact false, then the district court would have been right to find that the Caldwells were not prejudiced, but no factual findings were made regarding the veracity of

14

Bridgett's postconviction testimony. The district court erred by presuming on a cold record that Bridgett was telling the truth, and Gayle was lying.[1] The state courts proceeded as if the alibis were true, and that Bridgett would have testified at trial that it was true. The district court committed legal error in making inappropriate credibility findings and adopting the state courts' misapplication of federal law.

The dissent conflates cross-examination of a witness with the presentation of an alibi defense. Investigator Guy Goff stated on cross-examination that Bridgett and Gayle told him that Randy and Stevie Caldwell were home at the time of the fire. The dissent contends that, therefore, the substance of the alibi was admitted. An allusion to a defendant's potential alibi by a prosecution witness on cross-examination is a far cry from a defense counsel's presentation of two (or more) witnesses specifically stating on direct-examination that their husbands were home near and at the time of the fatal fire. Rather, viewed objectively, a reasonable fact-finder might even view the defense with *greater* incredulity after hearing an opening statement promising an alibi defense, hearing an allusion to an alibi raised during cross examination, and receiving *nothing* when the defense was finally presented with the opportunity to state its case. Viewed objectively, nothing occurred at trial excusing the failure to deliver the alibi witnesses.

---

[1] Similarly, the dissent baselessly contends that counsel may have perceived Bridgett Caldwell as not being a good witness because her trial testimony would have been a lie, but one could just as easily attribute Bridgett's change in testimony to her pending marriage to Dildine and a correspondingly acrimonious relationship amongst her, Dildine, and Stevie. Both deductions are equally speculative.

15

2. *Prejudice*

Having established that the TCCA unreasonably decided the issue of counsel's deficient performance and that the district court likewise erred, we must determine whether Petitioner's meet their burden of proving that counsel's representation prejudiced their trial. Petitioners must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693. A reasonable probability is a probability sufficient to making a finding of prejudice and to undermine confidence in an outcome. *Id.* at 693.

Trial counsel has been found ineffective when he or she fails to present exculpatory testimony. *See Stewart*, 468 F.3d at 355-61. In fact, this Court has recognized that when trial counsel fails to present an alibi witness, "[t]he difference between the case that was and the case that should have been is undeniable." *Id.* at 361. This Court has held that the failure to produce an alibi witness at trial was prejudicial under *Strickland*, even where the state postconviction court said the alibi witnesses would have been "unconvincing," and there were other alibi witnesses presented at trial. *See Bigelow v. Haviland*, 576 F.3d 284, 291 (6th Cir. 2009). This Court has also found a *Strickland* violation where counsel failed to present three favorable witnesses even though the state postconviction court said that one witness was "not particularly helpful" and another was "incredible." *See Ramonez*, 490 F.3d at 485-86. The prosecution chiefly relied on two witnesses and the defense had at least two witnesses to establish an alibi. Thus, the harm here is especially problematic where the jury was promised they would hear from those alibi witnesses and those

16

witnesses easily could have tipped the balance and resultantly, had the scales weighed in favor of the Caldwells.

In *Harrison v. Motley*, trial counsel promised the jury he would present an alibi defense during his opening statements. 478 F.3d 750, 752 (6th Cir. 2007). One witness recanted prior to trial, the second alibi witness recanted after the trial began, and another witness had credibility issues due to allegations of bribery. *Id.* at 757-58. Trial counsel called no witnesses. *Id.* at 753. This Court found trial counsel's actions did not prejudice the defense despite counsel's failure to present an alibi as promised due to recanting by the witnesses and the existence of severe credibility issues. *Id.* at 758-59; *see also Poindexter v. Mitchell*, 454 F.3d 564, 574-75 (6th Cir. 2006) (rejecting ineffective assistance of counsel claim where trial counsel promised an alibi defense in opening statement based upon the defendant's insistence, but also "prepared the jury for the probability that no alibi would be presented" and declined to present alibi where dogged investigation failed to substantiate alibi.)

*Harrison* is readily distinguishable from the facts here, and dictates that this court find counsel's decision objectively unreasonable and prejudicial. Lester told two stories—an inculpatory one and an exculpatory one—and the jury was to decide on which was true. The government bolstered Lester's inculpatory story with Roberts's testimony. Defense counsel could have bolstered Lester's exculpatory story by calling several witnesses, but counsel chose not to, despite having promised to produce them during opening statements. Contrary to *Harrison*, no recantations by the witnesses preceded trial or occurred during trial. The wives were ready to give live, sworn testimony that the Caldwells were at home during the fire. By promising the testimony of the wives and not

producing them, defense counsel exacerbated the error of not calling them, and "the jury likely concluded that counsel could not live up to the claims made in the opening." *Harris v. Reed*, 894 F.2d 871, 879 (7th Cir. 1990).

The dissent improperly characterizes Goff's testimony as equally forceful and equivalent to Bridgett and Gayle's ready testimony that would have established the Caldwells' alibi. As stated herein, the allusion to Bridgett and Gayle's ready alibi testimony by Goff is far from equivalent to having Bridgett and Gayle establish an alibi for Stevie and Randy in court. Also, the Caldwells' father was willing to give testimony indicating that Stevie and Randy were at home about an hour before the fire started. Further, Dildine was ready to testify that Gist had a dispute over money with Lester's father shortly before the fire, and would have given the jury reason to believe that Lester was lying to protect his father, Wayne, or his father's associates.

Contrasting the ready testimony of Bridgett, Gayle, the Caldwells' father, and Dildine with the testimony of Lester who admittedly gave inconsistent statements, Roberts, and remaining circumstantial evidence of a cigarette lighter, gallon jugs which many in the community used to carry fuel, and the testimony by two individuals that they heard a car with a loud muffler, also common to many in the community, there is a reasonable probability that the results would have been different had trial counsel not erred. Accordingly, we find that Petitioners met their burden of proving prejudice.

## III. CONCLUSION

For the foregoing reasons, the district court's determination is **REVERSED**, the certificate of appealability is **GRANTED** for the *Strickland v. Washington* claim, and the Caldwells' petitions

18

for writ of habeas corpus are **GRANTED**.  Stevie and Randy Caldwell are ordered released from

custody unless a retrial commences within 180 days.

Nos. 08-5156/08-5157
*Caldwell v. Lewis, Warden*

GRIFFIN, Circuit Judge, dissenting.

Once again, our court has failed to afford a state criminal judgment the deference required by law.[1] Because the Court of Criminal Appeals of Tennessee ("CCAT") did not unreasonably apply *Strickland v. Washington*, 466 U.S. 668 (1984), I would affirm the district court's denial of the petitions for writs of habeas corpus. Thus, I respectfully dissent.[2]

I.

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), we are prohibited from granting habeas relief on any claim adjudicated in state court unless the ruling:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, the Supreme Court emphasized our limited role under AEDPA in reviewing habeas claims:

> [I]t seems clear that Congress intended federal judges to attend with the utmost care to state-court decisions, including all of the reasons supporting their decisions, before

---

[1] With little or no avail, the Supreme Court has repeatedly reversed us on this issue. *See, e.g. Berghuis v. Smith*, 130 S. Ct. 1382 (2010); *Berghuis v. Thompkins*, 130 S. Ct. 2250 (2010); *Renico v. Lett*, 130 S. Ct. 1855 (2010); *Smith v. Spisak*, 130 S. Ct. 676 (2010); *Bobby v. Bies*, 129 S. Ct. 2145 (2009); *Bell v. Cone*, 543 U.S. 447 (2005); *Mitchell v. Esparza*, 540 U.S. 12 (2003); *Bell v. Cone*, 535 U.S. 685 (2002).

[2] Regarding the scope of the certificate of appealability ("COA"), I concur in that portion of the majority opinion that clarifies the COA based upon the apparent mistake.

20

concluding that those proceedings were infected by constitutional error sufficiently serious to warrant the issuance of the writ. . . . [F]ederal habeas courts must make as the starting point of their analysis the state courts' determinations of fact, including that aspect of a "mixed question" that rests on a finding of fact. AEDPA plainly sought to ensure a level of "deference to the determinations of state courts," provided those determinations did not conflict with federal law or apply federal law in an unreasonable way. Congress wished to curb delays, to prevent "retrials" on federal habeas, and to give effect to state convictions to the extent possible under law. When federal courts are able to fulfill these goals within the bounds of the law, AEDPA instructs them to do so.

529 U.S. 362, 386 (2000) (internal citation omitted).

In the present case, the habeas claims by petitioners Stevie and Randy Caldwell constitute an "unreasonable application" challenge under AEDPA. *See generally, Stuart v. Wilson*, 442 F.3d 506, 514 (6th Cir. 2006). In this regard, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). In my view, the application of federal law by the CCAT was *not* unreasonable. In hindsight, my colleagues would have ruled differently. However, even when a state court errs, we may substitute our judgment only if the state adjudication was *unreasonable*. Here, it was not.

II.

Petitioners contend that their defense attorneys were constitutionally ineffective for failing to call their father, William Caldwell, and wives, Bridgett and Gayle Caldwell, as alibi witnesses

after referencing their anticipated testimony during the opening statement. The CCAT correctly rejected this argument.[3]

In *Strickland*, the Supreme Court established a two-prong test regarding ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. Under this test, judicial scrutiny of counsel's performance is "highly deferential." *Id.* at 689. As the *Strickland* Court noted, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* Accordingly, "[w]e address not what is prudent or appropriate, but only what is constitutionally *compelled*," *United States v. Cronic*, 466 U.S. 648, 665, n.38 (1984) (emphasis added), and apply "a *strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance[,]" *Strickland*, 466 U.S. at 689 (emphasis added).

---

[3]Petitioners also allege that defense counsel was ineffective for the failure to call Timmy Dildine. However, Dildine was not referenced in defense counsel's opening statement. Accordingly, because the COA, as clarified, is limited to alleged ineffectiveness stemming from the failure to call witnesses referenced in defense counsel's opening statement, it is not necessary to address this testimony.

III.

In my view, the CCAT thoroughly and *reasonably* analyzed and ruled upon the issue of

defense counsel's alleged ineffectiveness. In pertinent part, the state court's analysis is as follows:

> In the opening statement, trial counsel stated that they expected the proof to show the petitioners were at home in bed with their wives during the night in question. No witnesses were called by the trial defense team.
>
> The putative alibi witnesses were: Bridgett Caldwell (wife of Stevie Caldwell), Gayle Caldwell (wife of Randy Caldwell), William Caldwell (father of petitioners), Eugene Mitchell, and Junior Emerton. At the post-conviction hearing, Bridgett Caldwell said she would have testified at trial that the petitioners were at home on the night of the offense. She further said this would have been perjured testimony, given due to pressure from Caldwell family members.
>
> Gayle Caldwell, wife of Randy Caldwell, testified at the post-conviction hearing that both petitioners were at home on the night of the offense except for a brief time when they went to a store. She admitted that after midnight, she only saw Randy Caldwell at about 2:00 a.m. and did not see Stevie Caldwell until the next morning. This testimony would not have been inconsistent with that State's theory as to the sequence of events.
>
> William Caldwell, father of petitioners, stated in his post-conviction testimony that both petitioners were at their home at 10:00 p.m. and 1:50 a.m. on the night of the offense.
>
> * * *
>
> A mock trial was conducted by trial defense counsel. All the proposed alibi witnesses, with the exception of Mitchell, were evaluated. Both attorneys had misgivings about the wives' capability as witnesses, although they did not question their credibility. As to William Caldwell, the trial attorneys doubted his testimony actually provided an alibi as to the significant times.
>
> A failure by trial defense counsel to present proof that was promised in opening statements may have such an adverse effect on the trial as to require reversal of the conviction. *State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). The trial transcript was not made an exhibit at the post-conviction proceeding, but we will review our record from the direct appeal. *State v. Townes*, 56 S.W.3d 30, 34

23

(Tenn. Crim. App. 2000). At trial, the State presented Guy Goff, the Chief Criminal
Investigator for White County Sheriff's Department. Goff went to the petitioners'
residence on December 8, 1994, the day of the offense, and separately interviewed
the petitioners, Lester Cunningham (their accomplice) and the petitioners' wives.
The following exchange with Goff occurred on cross-examination by Stevie
Caldwell's counsel:

Question: Okay. So when you got there and you got everybody separated and talked
to them in separate rooms and so forth, the consistent story, the theme that ran
through the testimony or the statements that you got from Stevie; from Bridgett; from
Randy; from Gail, Randy's wife; and from Boss was that they had fought chickens
there, all night, or fought chickens there up until the early morning hours, twelve or
so. Right?

Answer: Correct.

Question: And that they went to bed and slept there until a relative called about six
o'clock in the morning and told them that Luther Gist's house had been burned
down?

Answer: I don't, let's see, I don't recall if it was exactly six o'clock or not, but that's,
the rest of that's correct.

During closing argument, trial counsel for Stevie Caldwell was able to argue, without
objection, as follows: "We certainly could have called witnesses up here to testify
where those boys were that night. Their wives would have testified that they were
home with them."

During the mock trial, trial counsel had the opportunity to assess the proposed alibi
witnesses. Both counsel had obvious misgivings concerning the proposed alibi
witnesses. As the proof developed, counsel were able to put the wives' statements
of alibi into evidence through the Sheriff's chief investigator, Mr. Goff. Even in the
luminescence of hindsight, we cannot conclude that trial counsel's course of action
and tactical choices, as to the alibi witnesses, fell below the competence demanded
of attorneys in criminal cases.

*Caldwell v. Tennessee*, No. M2001-00334-CCA-R3-PC, 2002 WL 31730875, at *16-17 (Tenn.

Crim. App. Dec. 4, 2002).

Because the above analysis is not unreasonable, AEDPA requires us to deny the habeas petitions. Moreover, I agree with the CCAT that it was reasonable for defense counsel not to call the alibi witnesses because: (1) William Caldwell did not provide an alibi for the relevant time period; (2) the substance of the alibi defense was admitted through the testimony of investigator Guy Goff; and (3) defense counsel determined the wives were not good witnesses.[4]

It is critical that the decision regarding the alibi witnesses was deliberate and *strategic. See Lema v. United States*, 987 F.2d 48, 54 (1st Cir. 1993) ("The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony."). "[St]rategic choices made after thorough investigation of law and facts relevant to plausible options are *virtually unchallengeable*[.]" *Strickland*, 466 U.S. at 690 (emphasis added); *see also Wright v. Bell*, 619 F.3d 586, 596 (6th Cir. 2010) (it is not ineffective assistance of counsel to fail to call mitigation witness when decision was made "after thorough investigation"). Here, it is undisputed that the decision not to call the alibi witnesses was based on a thorough investigation. Indeed, after conducting a mock trial, defense counsel were fully aware of the strengths and weaknesses of the potential alibi testimony. Based upon their assessment, defense counsel made a deliberate and informed decision that the risks associated with calling the alibi witnesses outweighed

---

[4]While not known at the time of trial, one reason Bridgett Caldwell may not have been perceived as a good witness (although she was viewed as better than Gayle Caldwell) is because her testimony may have been perjury. According to her post-conviction testimony, "the petitioners were not really at home on the night of the fire, and she only agreed to testify that they were because the family put pressure on her." *Caldwell*, 2002 WL 31730875, at *6. She also admitted "that she told the district attorney's office a different story than the aforementioned version she related to the defense attorneys." *Id.*

the potential benefits, given how other events unfolded at trial. *See Caldwell*, 2002 WL 31730875, at *6 ("After the close of the State's proof, both attorneys felt that the case had gone as well for the defense and as bad for the State as they could have imagined."). The decision was objectively reasonable because "the risk of 'rocking the boat' may warrant a decision by trial counsel to forego the presentation of further defense testimony, even favorable testimony." *Lema*, 987 F.2d at 54; *see also United States v. Natanel*, 938 F.2d 302, 310 (1st Cir. 1991) ("In litigation as in life, there is much to be said for maxims such as 'if it ain't broke, don't fix it' and 'quit while you're ahead.'").

The majority cites several cases in support of their contention that the failure to call available alibi witnesses may constitute deficient performance. However, in each of these cases, counsel either failed to investigate the potential witnesses, or failed to file the required notice of alibi witness.[5] Accordingly, such decisions were not strategic. *See Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir. 2001) (a "strategic" decision entitled to deference is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client"). In contrast, there is no allegation in this

---

[5]*See Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (counsel ineffective when he "did not reasonably investigate [client's] alibi defense"); *Ramonez v. Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007) (decision not to call alibi witnesses "grounded on a fatally flawed foundation," as the attorney failed to engage "in the minimal-and-essential-step of interviewing the witnesses"); *Stewart v. Wolfenbarger*, 468 F.3d 338, 355 (6th Cir. 2006) (failure "to file a proper notice of alibi witnesses, and [failure] to investigate . . . a potential witness . . . . constitute deficient performance under *Strickland's* first prong"); *Towns v. Smith*, 395 F.3d 251, 259 (6th Cir. 2005) ("Without even attempting to interview [the witness], counsel simply decided not to call him[.]"); *Pavel v. Hollins*, 26 F.3d 210, 218-20 (2d Cir. 2001) (attorney's failure to call alibi witnesses "was animated primarily by a desire to save himself labor" and his "inadequate investigation"); *Harris v. Reed*, 894 F.2d 871, 879 (7th Cir. 1990) (Defense counsel's "decision not to present . . . the testimony of [two witnesses]-[was] a decision made without interviewing the witnesses[.]"); *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) (counsel "for no apparent reason failed to investigate a known and potentially important alibi witness").

case that defense counsel failed to investigate the relevant alibi witnesses, or failed to file the required notice of alibi. The fact that defense counsel conducted a mock trial demonstrates that their decision not to call such witnesses was a quintessential strategic decision entitled to the highest level of deference under *Strickland*.

While defense counsel promised alibi evidence during his opening statement, his failure to introduce the wives' testimony does not, in and of itself, constitute constitutionally deficient performance. *See Harrison v. Motley*, 478 F.3d 750, 758-59 (6th Cir. 2007) (holding the failure to call alibi witnesses promised during opening statement was not ineffective assistance of counsel); *see also Williams v. Bowersox*, 340 F.3d 667, 671-72 (8th Cir. 2003) ("[F]ailing to present witnesses promised in an opening is not always an error of a constitutional dimension."); *Schlager v. Washington*, 113 F.3d 763, 768-70 (7th Cir. 1997) (failure to call witness promised during opening statement not ineffective assistance of counsel). Indeed, if such were the rule, it would encourage counsel to perpetuate mistakes made during opening statements. Moreover, defense counsel did not fail to call the alibi witnesses out of inattentiveness. Rather, their decision not to call the witnesses was the result of a deliberate, strategic choice that such testimony would not be beneficial. *See Harrison*, 478 F.3d at 759 (the failure to call alibi witnesses mentioned during opening statement was "not due to inattentiveness by [defense] attorneys").

The majority contends that in assessing counsel's performance, courts are limited to considering the strategic reasoning expressly offered by the attorneys. According to the majority, we may not consider the testimony of Goff, nor the wives' capability as witnesses, in analyzing the reasonableness of defense counsel's performance. However, *Strickland* instructs that, for purposes

27

of our review, we must "determine whether, *in light of all the circumstances*, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690 (emphasis added). Our review is not from a subjective standpoint, but based upon an "*objective standard of reasonableness.*" *Id.* at 688 (emphasis added).[6] Accordingly, we must consider, from an objective perspective, all relevant facts and circumstances in order to assess whether the performance of counsel was constitutionally deficient.

Additionally, I note that Attorney Cantrell, in his professional judgment, did not believe that the wives were good witnesses, stating, "I didn't think [Gayle] did very good in the mock trial; I think she is limited in her abilities. Quite frankly, Bridgett would have probably made the better of the two (2), but that is like considering the lesser of the two (2) evils, actually." He also stated that neither Bridgett nor Gayle "did a good job testifying."

When viewed objectively, the performance of defense counsel was not constitutionally deficient. The deliberate and strategic decision by counsel not to call the alibi witnesses, and thus introduce cumulative evidence of an alibi through interested family members who were not good witnesses, was not an "error[] so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Thus, after applying the

---

[6]In assessing objective reasonableness, this court has analyzed whether reasonable strategic motives *may* have existed to support the decisions of counsel. *See e.g. Wright*, 2010 WL 3396839, at *9 (opining on possible strategic reasons for not calling mitigation witness, noting that the "attorneys could not recall . . . the exact reason they" made the decision); *United States v. Fortson*, 194 F.3d 730, 736 (6th Cir. 1999) ("We can conceive of numerous reasonable strategic motives for the decision.").

deference required under AEDPA, I would deny habeas relief because the ruling by the CCAT on

the issue of constitutionally deficient performance was not unreasonable.

IV.

Were petitioners to demonstrate that the CCAT unreasonably decided the issue of counsel's

alleged deficient performance, we would next decide whether they sustained their burden of proving

prejudice.[7]  Regarding our standard of review on this issue, petitioners contend that the strictures of

AEDPA do not apply because the CCAT did not make a specific finding regarding prejudice.  *See*

*Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) ("[W]hen a claim has not been adjudicated on the

merits in State court proceedings, . . . we look at the claim de novo rather than through the

deferential lens of AEDPA.") (internal quotation marks and citation omitted).  Petitioners appear to

be correct, and at oral argument respondent apparently conceded the point.  However, irrespective

of whether AEDPA deference applies, petitioners have failed to establish prejudice.

On the issue of prejudice, *Strickland* instructs:

> It is not enough for the defendant to show that the errors had some conceivable effect
> on the outcome of the proceeding.  Virtually every act or omission of counsel would
> meet that test[.]
>
> * * *
>
> The defendant must show that there is a reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding would have been different.  A

---

[7]In *Cronic*, the Supreme Court held that a criminal conviction must be reversed, without any specific showing of prejudice by the defendant, "when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding."  466 U.S. at 659 n.25.  Here, as described above, there is no evidence of an error by defense counsel reaching this magnitude. Accordingly, petitioners are required to establish prejudice to receive habeas relief.

reasonable probability is a probability sufficient to undermine confidence in the outcome.

466 U.S. at 693-94.

Accordingly, prejudice may not be presumed. Rather, it must be shown by petitioners based upon the evidence. *Id.* at 693 ("[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant *affirmatively prove* prejudice.") (emphasis added). The majority, however, does not analyze the evidence to determine whether, but for the alleged error, there was a *reasonable probability* that the verdicts would have been different. Instead, in conclusory fashion, they assume prejudice based upon the error.

Following my thorough review of the record, I conclude that petitioners have failed to sustain their burden of demonstrating prejudice. First, in order to establish prejudice, "the new evidence that a habeas petitioner presents must differ in a substantial way - in strength and subject matter - from the evidence actually presented[.]" *Hill*, 400 F.3d at 319. Here, the alibi evidence *was admitted* through the testimony of Goff, and because no objection was made, the statement retained its full evidentiary value. *See Diaz v. United States*, 223 U.S. 442, 450 (1912) ("[W]hen [hearsay] evidence . . . is admitted without objection, it is to be considered and given its natural probative effect as if it were in law admissible."); *Glenn v. United States*, 271 F.2d 880, 883 (6th Cir. 1959) ("Ordinarily, where no objection is taken to the reception of hearsay testimony it may properly be considered, and given its natural probative effect as if it were in law admissible."); 1 *McCormick on Evidence* § 54 (6th ed. 2006) ("If the testimony is received without objection, it becomes part of the evidence in the case and is usable as proof to the extent of its rational persuasive power."). Moreover, defense

counsel stated during closing argument, without objection, that the wives would have supported the alibi. ("We certainly could have called witnesses up here to testify where those boys were that night. Their wives would have testified that they were home with them.") Accordingly, the testimony of the alibi witnesses would not "differ in a substantial way" from the evidence that was presented.

Second, the case against petitioners was strong. *See Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2005) ("In determining whether prejudice has resulted from counsel's errors, a court must consider the totality of the evidence before the jury[.]") (internal quotation marks and citation omitted). Linville Roberts testified that on the night of the fire, at about 3:00 a.m., Stevie Caldwell and Lester Cunningham appeared at her door, made phone calls, and stayed at her home for several hours. Accordingly, this testimony of a disinterested witness would have discredited the alibi testimony of the family members.

Moreover, the crime itself was chronicled by an eyewitness and accomplice, Lester Cunningham. This detailed testimony was corroborated by physical and circumstantial evidence which included: (1) two plastic gallon jugs discovered in Randy Caldwell's car containing an accelerant; (2) a cigarette lighter found in Stevie Caldwell's pocket; (3) the testimony of Edward Bain and Norman Roberts that on the night of the arson, they heard the sound of a car with a loud muffler similar to the sound of Randy Caldwell's vehicle at 1:50 a.m. and 2:15 a.m., respectively; and (4) the testimony of Linville Roberts that on the night of the arson Stevie Caldwell and Cunningham appeared at her door around 3:00 in the morning. *Caldwell*, 2002 WL 31730875, at *3-4.

In my view, it is not reasonably probable that the verdicts would have been different had the family members testified. *See generally, Smith v. Jago*, 888 F.2d 399, 409 (6th Cir. 1989) ("[W]e do not believe that [the witness'] testimony, in light of its dubious credibility . . . would be sufficient to raise a reasonable doubt in the minds of the jurors.").

V.

For these reasons, I respectfully dissent. I would affirm the district court's order denying the petitions for writs of habeas corpus.